UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| CASSANDRA YVETTE LEMON, )<br>)<br>Plaintiff, )<br>)<br>-vs- )<br>)<br>KILOLO KIJAKAZI,[1] )<br>Acting Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No.: 4:20-cv-02310-TER<br><br>**ORDER** |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for supplemental security income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

**A.    Procedural History**

Plaintiff filed an application on June 2, 2016, alleging disability beginning on January 9, 2015. (Tr. 13). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on February 27, 2019, at which time Plaintiff and a vocational expert (VE) testified. (Tr. 13). After a post-hearing consultative exam, a second hearing was held on August 13, 2019. (Tr. 35). The Administrative Law Judge (ALJ) issued an unfavorable

---

[1] Recently, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), she is automatically substituted for Defendant Andrew Saul who was the Commissioner of Social Security when this action was filed.

decision on August 23, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 13-25). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request for review. On June 18, 2020, Plaintiff filed this action. (ECF No. 1).

**B.   Plaintiff's Background and Medical History**

Plaintiff was born on August 25, 1983, and was thirty-two years old on the date the application was filed. (Tr. 24). Plaintiff has no past relevant work. (Tr. 24). Plaintiff alleges disability originally due to major depressive disorder, bipolar, severe anxiety disorder, agoraphobia, panic disorder, arthritis, and obesity. (Tr. 81-82). Relevant records will be discussed under pertinent issue headings.

**C.   The ALJ's Decision**

In the decision of August 23, 2019, the ALJ made the following findings of fact and conclusions of law (Tr. 13-25):

1. The claimant has not engaged in substantial gainful activity since June 2, 2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: schizoaffective disorder, bipolar type; panic disorder with agoraphobia; and alcohol use disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can work at unprotected heights and with moving mechanical parts frequently. The claimant can sustain concentration, persistence and pace sufficient to perform simple, routine tasks in two-hour blocks at GED no greater than 2. She is able to perform simple work-related decisions,

       frequently interact with supervisors, occasionally interact with coworkers and never interact with the public.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on August 25, 1983 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 2, 2016, the date the application was filed (20 CFR 416.920(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in the RFC determination by not explaining how the finding of a moderation limitation in ability to maintain concentration, persistence, and pace was accounted for in the RFC of "can sustain concentration, persistence and pace sufficient to perform simple, routine tasks in two-hour blocks at GED no greater than 2," where such breaks are normal work breaks and argues thus there was no accommodation. Plaintiff argues the ALJ failed to account for limitations in interacting with supervisors and coworkers, particularly that the ALJ does not address restrictions as to ability to work in tandem, proximity, or in a team dependent manner. The Commissioner argues the decision was supported by substantial evidence.

**A.**     **LEGAL FRAMEWORK**

**1.     The Commissioner's Determination–of–Disability Process**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20

4

whether the impairment prevents him from doing SGA. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the

---

C.F.R. § 404.1520(h).

Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.     ANALYSIS**

**RFC**

Plaintiff argues the ALJ erred in the RFC determination as to social interaction and concentration, persistence, and pace(CPP).

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c). In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* Additionally, " 'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.' " *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

*CPP*

Plaintiff argues the ALJ erred in the RFC determination by not explaining how the finding of a moderation limitation in ability to maintain concentration, persistence, and pace(CPP) was accounted for in the RFC of "can sustain concentration, persistence and pace sufficient to perform

simple, routine tasks in two-hour blocks at GED no greater than 2," where such breaks are normal work breaks and argues thus there was no accommodation.

Under *Mascio*, once an ALJ has made an earlier finding that a claimant suffers from moderate difficulties in concentration, persistence, or pace, the ALJ must either include a corresponding limitation in the RFC assessment or explain why no such limitation is necessary. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). The Fourth Circuit held that an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the RFC or the hypothetical question to the vocational expert to simple, routine tasks or unskilled work. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015). "As Mascio points out, the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence, or pace." *Id.* The functional area of "concentrate, persist, or maintain pace" refers to the ability to "focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, Subpart P, App. 1 § 12.00(E)(3)(includes examples of this mental functioning area).

At the Listing analysis, the ALJ found moderation limitations in CPP:

> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that she has limitations in concentrating generally, focusing generally, completing tasks, avoiding distractions, and maintaining a regular work schedule. On the other hand, the claimant said that she is also able to drive, prepare meals, watch TV, read, manage funds, use the internet, and handle her own medical care. Additionally, **the record fails to show any mention of distractibility and an inability to complete testing that assesses concentration and attention**. She was able to attend to and answer questions appropriately at the hearing. The claimant had moderate limitation in this domain (Exhibits 5E, 11E, 14F, 18F; Testimony).

(Tr. 17)(emphasis added).

The ALJ gave an RFC of: can sustain CPP sufficient to perform simple, routine tasks in two-hour blocks at GED no greater than 2 and able to perform simple work-related decisions. (Tr. 18). The ALJ summarized Plaintiff's allegations regarding her mental health. (Tr. 18). The ALJ then found that the evidence is consistent with the RFC and the evidence did not reflect the level of functional restriction asserted by Plaintiff. (Tr. 19). The ALJ then thoroughly considered Plaintiff's mental health treatment:

> Previously, the claimant was treated at Spartanburg Area Mental Health Center (MHC) from November 4, 2013 through April 30, 2015, at which point she was discharged for not coming in for services and her case was closed. She carried diagnoses of major depression and bipolar disorder with panic disorder (Exhibit 2F). On June 2, 2015, the claimant requested to restart services after she had moved back to South Carolina. She was 31 weeks pregnant and did not want medications until after her baby was born. On exam, the claimant was calm, her speech was pressured but her thought process and content were normal, she asserted some auditory hallucinations but denied suicidal ideation, her mood was depressed but her affect was appropriate, she was fully oriented, her memory was intact, her concentration and attention were intact and her judgment and insight were good. She was assessed with bipolar disorder and panic disorder (Exhibit 2F, p. 6-7). The claimant was restarted on medication on August 21, 2015 (Exhibit 2F, p. 8). On February 3, 2016, the claimant presented after having not followed up since August and having missed 2 appointments (Exhibit 2F, p. 12). She reported symptoms of mania and her medications were adjusted (Exhibit 2F, p. 13).
>
> In a follow-up with MHC on April 18, 2016, the claimant was noted to be psychiatrically stabilizing with the adjustments of her medications. She did not report extreme mood instability, she reported feeling tearful but felt it was related to familial stress and she did not report any suicidal ideation or plan. She currently denied any psychotic symptoms and she was noted to be moving in a positive direction. She was enrolled in classes for a bachelor's degree online. On exam, the claimant had no abnormal movements, she was calm, her speech was normal, her thought process and content were normal, she denied any hallucinations, her mood was euthymic, her affect was appropriate and she was fully oriented with intact judgment and fair judgment (Exhibit 2F, p. 18). The claimant's medication had to be adjusted due to a rash from Latuda and she reported manic symptoms and mood instability following same (Exhibit 3F). On August 8, 2016, her medications were adjusted (Exhibit 3F, p. 7).

9

> On November 30, 2016, the claimant presented to MHC with increased symptoms after multiple missed appointments and after having not been on medication for a month (Exhibit 5F, p. 3).

(Tr. 19).

The ALJ continued the chronological detailed discussion of Plaintiff's mental health records with 2017 and 2018 notes:

> In a follow-up on January 11, 2017, the claimant reported some ongoing racing thoughts and voices but she reported that her medications were helping some and she denied any suicidal or homicidal ideation or plan. Her medications were helping her panic attacks (Exhibit 5F, p. 5). On exam, her mood was depressed but her behavior was calm, her speech was normal and her attention was intact (Exhibit 5F, p. 6). On March 8, 2017, in a presentation to MGC Family Medicine, the claimant was alert and oriented, her mood and affect were bright, she maintained eye contact and her behavior, judgment and thought content were all normal (Exhibit 6F, p. 37).
>
> On August 24, 2017, the claimant followed up with MHC with reports that she was not doing well. She had irritability, anger, dysphoria, and paranoia and she was isolating. She reported that she was referred to therapy but had not been going regularly and she denied any active suicidal ideation. On exam, the claimant's speech was pressured, her mood was depressed, she reported persecutory delusions, but her attention was intact and she was fully oriented (Exhibit 13F, p. 3). She was diagnosed with bipolar I disorder with psychotic features and agoraphobia and her medications were adjusted (Exhibit 13F, p. 4). On October 11, 2017, the claimant reported that her moods had stabilized, she was hearing voices less and she denied any suicidal ideation or plan but had some ongoing anxiety. On exam, her speech was normal, she reported occasional hallucinations but she was fully oriented, her attention was intact and her judgment was fair (Exhibit 13F, p. 7).
>
> The claimant did not follow-up again with MHC until July 5, 2018 and she reported that she had been out of medications for three or four months. She reported that her medications were helping her when she took them but now her symptoms had returned (Exhibit 13F, p. 9). She was restarted on her medications but due to her history of noncompliance, she was offered fewer refills to encourage compliance (Exhibit 13F, p. 10). On July 28, 2018, the claimant reported that she was starting to notice a reduction in symptoms and her mood was stabilizing. She denied any hallucinations or panic attacks and she expressed interest in therapy to help with reduction of situational stressors and management of her mood disorder (Exhibit 13F, p. 11). On exam, the claimant was calm, her speech was normal, her thought process and content were normal other than some reported delusions, her mood was

> euthymic, her affect was appropriate and her attention was intact (Exhibit 13F, p. 11). On November 20, 2018, the claimant reported that she felt her combination of medications were effective and she did not report any extreme mood instability symptoms. She was noted to be gradually stabilizing and her mental status exam was essentially benign (Exhibit 13F, p. 21).

(Tr. 19-20).

The ALJ then discussed the one time exam of Dr. Quirk. Ph.D. from March 2019, citing Exhibit 14F. (Tr. 20). The ALJ noted Plaintiff's reported to Dr. Quirk that she had panic attacks and depression. The ALJ noted Plaintiff reported that her daily activities included spending the day with her three year old and picking up her other children from school. (Tr. 20). Plaintiff's recall was somewhat impaired. She was assessed with schizoaffective disorder, bipolar type, currently in partial remission; panic disorder; agoraphobia; and alcohol use disorder, moderate severity. (Tr. 20). Later, the ALJ weighed this opinion and noted it was somewhat vague as to specific limitations but was overall consistent with ability to perform unskilled work with social limitations. (Tr. 23).

The ALJ considered mental health evidence from 2019 after a gap in treatment:

> The claimant followed up with MHC on June 19, 2019, where it was noted that she had not been seen in six months reportedly due to other health issues. She reported some ongoing racing thoughts and worry but denied any suicidal or homicidal ideation, depressive symptoms or manic symptoms. On exam, she was cooperative, her speech was normal her thought process and content was normal, her mood was irritable but her attention was intact, she was fully oriented and her judgment and insight were fair. She reported that she wished to terminate services with the MHC and requested her records be sent to Dr. Fuller with Medical Group of the Carolinas (MGC). She was discharged accordingly (Exhibit 16F).

> She presented for a psychiatric intake assessment at MGC on July 19, 2019 for treatment of her bipolar disorder diagnosis, depression and anxiety. She reported that she struggled with alcohol use but she did not have the resources to go to the liquor stores and she last used alcohol a month prior. She denied any side effects of her medication (Exhibit 18F, p. 4). She was noted to be irritable and somewhat hyperverbal but her speech was not pressured. A mental status exam revealed the claimant was fully oriented, she was well-groomed, she had no slowing or

> psychomotor agitation, she was depressed and anxious and her affect was irritable but she denied any hallucinations or delusions, she denied any suicidal or homicidal ideation, her thought process was overdescriptive but her insight and judgment were good, her attention was intact, her memory was grossly intact and her gait was normal. She was assessed with bipolar I disorder, alcohol use disorder in sustained remission, unspecified psychosis and borderline personality disorder. She was noted to possibly be in some mixed state - functioning well however and not meeting any criteria for hospitalization. Her medications were adjusted, as she had been off them for a few weeks because she said they were not helpful.
>
> Overall, the record supports the residual functional capacity.

(Tr. 21).

In concluding, the ALJ found that Plaintiff was treated only conservatively, never admitted or seen in an emergency care for stabilization. The ALJ noted Plaintiff was consistently noncompliant with medication and treatment. (Tr. 21). The ALJ noted abnormal exams but that they were most prevalent when not on medication or in the process of medication adjustments. (Tr. 22). The ALJ noted that once Plaintiff was on medications, exams were generally normal, with citation to Exhibits 2F, 3F, 5F, 8F, and 18F. (Tr. 22). The ALJ then found that the RFC was consistent with moderate limitations in CPP: "The claimant's subjective complaints, treatment history, and objective findings are consistent with her ability to perform simple work for two-hour periods of time with limited social interactions." (Tr. 22).

Here, the ALJ further relied on state agency opinions, noting SSR 17-2p's requirements and giving great weight to the state agency opinions. The ALJ found:

> **Specifically, DDS determined that the claimant had no severe physical impairment and was capable of performing simple work in 2-hour increments with no ongoing interaction with the public. This is consistent with the claimant's conservative mental health treatment regimen and is further supported by the claimant's improvement in symptoms once stabilized on medication, but with evidence of noncompliance. This is consistent with reports of auditory hallucinations and with mental status exams showing some**

> **depression and anxiety as well as possible mild memory impairment but with normal attention and concentration and fair to good judgment. Finally, this is supported by the claimant's daily activities**, including her ability to care for her children, drive, go shopping at stores during off-peak hours, prepare meals, write, read and watch television. Although I have given greater consideration to the claimant's complaints of problems around others and imposed greater limitations with coworkers and supervisors, the record does not support greater limitations than those set forth in the claimant's residual functional capacity.

(Tr. 23)(emphasis added).

As to Plaintiff's argument that two hour increment RFCs could never provide an accommodation for moderate limitations in CPP because it equates to a normal workday,[4] an ALJ's finding of a normal workday in addition to other limitations may not be error under *Mascio* as long as supported by substantial evidence in the record, such as a physician finding the same. *See Shinaberry v. Saul*, 952 F.3d 113, 121-123 (4th Cir. 2020)(finding an RFC of only simple, routine, and repetitive tasks without any hour increment findings accounted for claimant's moderate CPP limitations where the ALJ "discussed in detail the psychological evaluations performed by the SSA psychological consultants and Dr. Burlingame, as well as Shinaberry's adult function report, and sufficiently explained" why the RFC accounted for moderate CPP limitations); (ECF No. 17 at 9); *Norris-Gremillion v. Saul,* No. 9:19-CV-917-TMC, 2020 WL 6737669, at *3-4 (D.S.C. Nov. 17, 2020)(discussing an ALJ's reliance on two opinions of two hour limitation and finding no *Mascio* error). As discussed above, the ALJ's finding of two hour increments was discussed in the RFC narrative and citation to supporting substantial evidence was made by the ALJ. The ALJ here complied with *Mascio* and the findings here are more akin to *Shinaberry*. As to Plaintiff's arguments regarding a proper function by function analysis, the ALJ's RFC and RFC narrative is supported by

---

[4] *See* SSR 96–9p.

substantial evidence as displayed above. The RFC discussion by the ALJ permitted meaningful review.[5]

*Social*

Plaintiff argues the ALJ failed to account for limitations in interacting with supervisors and coworkers, particularly that the ALJ does not address restrictions as to ability to work in tandem, proximity, or in a team dependent manner.

First, no Fourth Circuit Court of Appeals decision has extended *Mascio*'s reasoning to "moderate" limitations in "interacting with others." There is no "conversion" rule/required accommodation in the RFC when a "moderate" social limitation is found at an earlier step; the normal RFC regulations still apply— that the ALJ must support the RFC findings with substantial evidence.

Plaintiff desires additional restrictions in the RFC as to proximity, team dependent tasks, and occasional interaction with supervisors but does not cite any record evidence in support that the ALJ did not consider. (ECF No. 17 at 15-16); (ECF No. 19 at 5).

Here, the RFC expressly limited Plaintiff to frequent interaction with supervisors, occasional interaction with coworkers, and never any interaction with the public. (Tr. 18). The ALJ noted beforehand:

> In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that she has difficulty engaging in social activities, getting along with others, dealing appropriately with authority, and spending time in crowds. However, according to her statements, the claimant is also able to shop during off-peak hours, spend time with family, and live with others. Finally, the medical evidence shows

---

[5] Remand may be appropriate when there is no function by function analysis, but remand is only appropriate when meaningful review is frustrated and the court is "unable to fathom the rationale in relation to evidence in the record. *See Mascio*, 780 F.3d at 636 (*citing Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Such is not the case here on either account.

> that the claimant had a good rapport with providers, was described as pleasant and cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments. She interacted appropriately at the hearing. The claimant had moderate limitation in this domain (Exhibits 5E, 11lE, 14F, 18F; Testimony).

(Tr. 17). The ALJ considered Plaintiff's testimony that she lived with her three children, that she had some difficulty getting along with others, was uncomfortable being around a lot of people, and went to the store early or late when it was not busy. (Tr. 18). The ALJ considered all of Plaintiff's mental health treatment as already summarized above. (Tr. 19-21). The ALJ noted as to social concerns that Plaintiff reported to Dr. Quirk that she did not get along well with people but her relationship with her mother had improved and she was close to her children and her sister. Plaintiff easily engaged with Dr. Quirk and rapport was rapidly established. (Tr. 20). The ALJ later found that Dr. Quirk's opinion although somewhat vague was consistent with evidence suggesting Plaintiff may be irritable but was functional. (Tr. 23). The ALJ found that the RFC with limited social interactions was consistent with Plaintiff's subjective complaints, treatment history, and objective exams. (Tr. 22). "Treatment notes suggesting that the claimant had no problems establishing rapport with providers does not support greater limitations (Exhibit 14F)." (Tr. 22). The ALJ noted the social interaction limitations opined by state agency consultants, particularly no ongoing interaction with the public, citing that the treatment record, exam reports, and daily activities reports were consistent with this. The ALJ gave additional limitations, greater than those opinions, as to coworkers and supervisors: "Although I have given greater consideration to the claimant's complaints of problems around others and imposed greater limitations with coworkers and supervisors, the record does not support greater limitations than those set forth in the claimant's residual functional capacity." (Tr. 23). The ALJ expressly stated that there was no evidence from a physician of limits greater than the RFC determination. (Tr. 23). Contrary to Plaintiff's argument, the record shows non-examining state

15

agency consultants did not find that Plaintiff could not work in tandem, proximity or in a team dependent manner but did find that even with moderate limitations in interacting with others that Plaintiff was able to respond appropriately to supervision and coworkers; further, the ALJ found Plaintiff was limited to only occasional interaction with coworkers. (Tr. 106).

The RFC as to social interaction was supported by citation to substantial evidence.

### III.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

|  |  |
|---|---|
| August 18, 2021 | s/ Thomas E. Rogers, III |
| Florence, South Carolina | Thomas E. Rogers, III |
|  | United States Magistrate Judge |

16